UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

# FILED

JUL 1 4 2008

**Clerk,** U.S. District and
Bankruptcy Courts

JIM LEMON

714 Hunter Court, SW

Vienna, VA 22180

(703-242-6254)-h

(202-336-7462)-w

Plaintiff, proceeding *pro se*

v.

THE HONORABLE DONALD C. WINTER

Secretary of the Navy

The Pentagon

Room 4E686

Washington, D.C. 20350

Case: 1:08-cv-01197
Assigned To : Lamberth, Royce C.
Assign. Date : 7/14/2008
Description: Admn. Agency Review

CIVIL ACTION NO. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. This case challenges the scope and adequacy of an Environmental Impact Statement ("EIS") issued by the Navy with regard to its evaluation of the cumulative impacts on the environment of new facilities to be

1

constructed and operated, in accordance with Public Law 101-510, the Defense Base Closure and Realignment Act of 1990 ("BRAC Law") as amended in 2005, at the National Naval Medical Center (NNMC), Bethesda, Maryland ("the proposed action").

2. According to the President's Council on Environmental Quality, evidence is increasing that the most devastating environmental effects may be the result of cumulative impacts. As defined by regulation, cumulative impact means "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 CFR 1508.7 In preparing an EIS, agencies must disclose the "environmental consequences" of a proposed agency action, including its direct, indirect, and cumulative impacts, and consider means to mitigate those consequences. 40 CFR 1502.16(a), (b), 1508.8.

3. The Navy's EIS for the proposed action omitted or failed to adequately evaluate the cumulative impacts of the proposed action on utilities, land use, cultural resources, air quality and global climate change, even though it is well-known -- and has been highly publicized -- that the incremental impacts of actions such as the proposed action, when added to other past, present and reasonably foreseeable future actions, will have significant impacts on those aspects of the environment, as follows:

A. The proposed action will have a cumulative impact on the demand for increased imports of electricity from the west into the Mid-Atlantic Critical Congestion Area ("MACCA"), a geographic area recently defined by the Department of Energy ("DOE") where electricity congestion problems are severe. The proposed action and Plaintiff's home and work site are all located in the MACCA and depend on the reliability of the area's regional electricity grid. According to DOE, the ever-increasing cumulative demand for more imports of electricity into the MACCA is exacerbating the region's critical electricity congestion problems, thereby increasing the risk of electrical brownouts and blackouts that will compromise the safety and well-being of the Nation's capital and the

2

world's leading financial and communications centers, and many other facilities critical to national security and defense, and the millions of people who live and work in the MACCA.

B. The proposed action will have a cumulative impact on the demand for the mining of more coal from West Virginia, thereby increasing the need for environmentally destructive mountaintop mining of coal in that state, the physical beauty of which Plaintiff enjoys and desires to protect.

C. The proposed action will have a cumulative impact on the demand for the construction of additional high-voltage electricity transmission lines that will cross or adversely effect carefully protected private property and preserved historic sites and national parks, which Plaintiff enjoys and desires to protect, and which are located within the Mid-Atlantic National Interest Electric Corridor, an even larger geographic area (of which the MACCA is a part) recently designated by the Department of Energy.

D. The proposed action will have a cumulative impact on the demand for increased burning of coal in coal-fired electricity power plants west of Air-Quality Control Region 47 ("AQCR-47"), a geographic area designated by the U.S. Environmental Protection Agency ("EPA"). That will increase the amount ozone in AQRS-47, which comprises the Washington, D.C. metropolitan area where the proposed action is located and where Plaintiff lives, works and breathes. ACQR-47 is in violation of the National Ambient Air Quality Standards ("NAAQS") for ozone. The Environmental Protection Agency promulgated the NAAQS for the protection of public health and welfare. AQCR-47 is in an "ozone transport region" where ozone is transported into the Washington, D.C. metropolitan region from the west by air currents. Emissions from coal-fired electricity power plants to the west of AQCR-47 are a major precursor of that transported ozone.

E. The proposed action's cumulative impact on the demand for increased burning of coal in coal-fired power plants to the west will worsen the haze in Shenandoah National Park and Gettysburg National Military Park, which Plaintiff enjoys and desires to protect. The National Parks Conservation Association recently issued a report designating Shenandoah National Park as one of ten National Parks most threatened by pollution from coal-fired power plants.

3

F. The proposed action's cumulative impact on the demand for increased burning of coal in coal-fired power plants will increase the amount of carbon dioxide into the atmosphere. Based on information and belief, that will exacerbate global climate change.

4. The impacts that were not evaluated in the Navy's EIS are obvious and significant, therefore it does not meet the purposes of the National Environmental Policy Act of 1969 ("NEPA"). The Navy's failure to evaluate these impacts violates NEPA. Nevertheless, on May 14, 2008 the Navy issued Record of Decision ("ROD") announcing its plans to proceed with the proposed action analyzed in the EIS. With this lawsuit, plaintiff seeks to enjoin the Navy from proceeding with any aspect of the proposed action that would preclude mitigation of the cumulative impacts described above, until the agency confronts those impacts by formally revising the EIS and making it available for public comment in a supplemental or revised draft EIS ("DEIS").

**JURISDICTION AND VENUE**

5. This action arises under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et. seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

7. Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to this case occurred in this District, and because federal defendant Winter resides in this District.

**PARTIES**

8. Plaintiff Jim Lemon resides in Vienna, VA and works in Washington, D.C. Both his residence and work site are located in both the MACCA and the Mid-Atlantic National Interest Electric Transmission Corridor, and in AQCR-47. At home and at work, he relies on electricity provided through the same regional electricity grid that supplies electricity to the proposed federal action. He also breathes the local air,

4

enjoys the viewsheds of Shenandoah National Park, Gettysburg National Military Park and the mountains of West Virginia. He is actively engaged in protecting historic sites and scenic areas from inappropriate development. He also enjoys and has grown accustomed to historically average weather patterns in the Washington, D.C. region that are now threatened by global climate change.

9. Defendant Donald Winter is the U.S. Secretary of the Navy and in that capacity has final responsibility for actions taken by the Navy. Mr. Winter is sued in his official capacity.

## TIME IS OF THE ESSENCE IN THIS MATTER

10. The proposed $1 billion federal action which is the subject of this complaint is urgently needed in order to merge the resources of the Army, Navy and Air Force to make it easier for medical professionals from all three services to collaborate and treat patients. Consolidation will mean that Army, Navy and Air Force personnel, many with traumatic brain injuries, post-traumatic stress disorder, and/or amputations suffered in Iraq and Afghanistan can be treated in a single, centralized military health-care center. In accordance with BRAC law, WRNNMC must be completed by 15 September 2011. For these reasons, time is of the essence for the Navy to examine the cumulative impacts of the proposed action and consider means to mitigate those impacts in accordance with NEPA.

## PROPOSED FEDERAL ACTION, ENVIRONMENTAL IMPACT STATEMENT, AND RECORD OF DECISION

11. Proposed Federal Action: Under the Defense Base Closure and Realignment ("BRAC") Act of 1990, Public Law 101-510, as amended in 2005 ("BRAC Law"), the Walter Reed Army Medical Center must realign all tertiary and complex health care services to the National Military Medical Center campus in Bethesda, MD. This will create a new premier military health care center in Bethesda to be named the Walter Reed National Military Medical Center ("WRNNMC"). The subject realignment requires additional facilities and infrastructure to accommodate an increase of both inpatient and outpatient health care services provided at the NNMC campus. When completed, WRNNMC will result in almost $1 billion of additional facilities in Bethesda with approximately 1,144,000 square feet (SF) of new building

5

construction, 508,000 SF of renovation to existing building space, and 824,000 SF of new parking facilities. It will accommodate approximately 2,500 additional staff and an estimated 1,862 patients and visitors each weekday. The new construction and improvements to existing facilities will provide medical care and administration additions and alterations; a National Intrepid Center of Excellence for traumatic brain injury and psychological health care; permanent and temporary lodging facilities; a new physical fitness center; additional parking; and road and utility improvements on the installation as needed to support the new facilities.

12. Environmental Impact Statement ("EIS"): The Navy prepared an EIS to examine the potential environmental impacts of the construction and operation of the new facilities associated with the proposed federal action. The EIS was prepared pursuant to Section (102)(2)(c) of the National Environmental Policy Act (NEPA) of 1969, the regulations implemented by the Council on Environmental Quality (CEQ) (40 CFR Parts 1500 – 1508), Department of the Navy NEPA implementing regulations at 32 CFR Part 775, OPNAVINST 5090.1C, the Navy's Environmental Readiness Program Manual, and the Supplemental Environmental Planning Policy, 23 September 2004.

13. Record of Decision ("ROD"): On May 14, 2008, the Navy issued a ROD announcing its decision, pursuant to Section 102(2)(c) of the National Environmental Policy Act (NEPA) of 1969, 42 U.S.C. Section 4332(2)(c), the regulations of the Council on Environmental Quality (CEQ) for Implementing the Procedural Provisions of (40 CFR parts 1500–1508) and the Department of the Navy (DON) NEPA regulation (32 CFR part 775), to implement the proposed federal action as set out in the Preferred Alternative described in the Final Environmental Impact Statement (Final EIS). The ROD is the final agency action to date with regard to the proposed action.

**THE EIS DID NOT EVALUATE CUMULATIVE IMPACTS**

14. The scope of the Navy's cumulative impact analysis is too narrow and leaves out important cumulative impacts. Furthermore, where the analysis does mention cumulative impacts, it does not adequately address them in detail. The Navy failed to take a "hard look" at the environmental consequences of the cumulative effects of the proposed action and means to mitigate those

6

consequences. The Navy's DEIS, FEIS and ROD contained only conclusory or broad, general statements devoid of reasoned conclusions with regard to the cumulative impacts addressed in this complaint. For these reasons, the Navy's EIS is clearly deficient and lacking in analysis because omitted important cumulative impacts and failed to adequately evaluate others, specifically with regard to the cumulative impacts of the proposed action on utilities, land use, cultural resources, air quality and global climate change. As described below, those impacts were obvious and are significant.

## THE CUMULATIVE IMPACTS NOT EVALUATED WERE OBVIOUS AND ARE SIGNIFICANT

15. The following is a timeline of government actions, prominent news articles and other actions informative to the cumulative impacts of the proposed federal action.

16. On August 8, 2006, the Department of Energy ("DOE") issued its National Electric Transmission Congestion Study ("Congestion Study"), wherein it identified the Atlantic coastal area from metropolitan New York southward through Northern Virginia as the Mid-Atlantic Critical Congestion Area ("MACCA"), and described it as "an area that is large, densely populated and economically vital to the nation ... where it is critically important to remedy existing or growing [electricity] congestion problems because the current and/or projected effects of the congestion are severe." The Congestion Study includes the following statements about the MACCA:

- *"[The MACCA] is one continuous congestion area [that] requires billions of dollars of investment in new transmission, generation, and demand-side resources over the next decade to protect grid reliability and ensure the area's economic vitality. Planning for the siting, financing, and construction of these facilities is urgent."*
- *"[The MACCA] also includes the Nation's capital and the world's leading financial and communications centers, and many other facilities critical to national security and defense."*
- *"Inability of the [electricity] grid to sustain reliable affordable electricity deliveries to the [MACCA] would compromise the safety and well-being of the Nation as well as the millions who live and work in the region."*

7

- "[One of three primary ways to deal with the congestion problem in the MACCA is to] reduce electricity demand (and net import needs) within the load pocket, through some combination of energy efficiency, demand response, and distributed generation."

- "...load pockets around Washington, D.C. ...need major investments in new transmission, generation and demand management to improve reliability and reduce consumer costs."

17. On September 10, 2006, the Washington Post published a front page article entitled "Power Line Could Undo Open-Land Conservation" that included the following statements:

- Dominion Virginia Power is planning to build a high-voltage power line that could stretch across parts of Prince William, Fauquier and Loudoun counties, an answer to the region's growing energy needs that has raised fears of spoiling some of the state's most fiercely protected open land.

- The area Dominion is considering for local portions of the line includes thousands of acres of private property, nature preserves and historic districts as well as a half-dozen Civil War battlefields and about 80,000 acres of forest and farmland protected from development through conservation easements. Cutting across them would be hundreds of 15-story towers, with cables stretching in between.

- "The transmission lines that we have right now are getting loaded up during real hot days and real cold days," said John D. Smatlak, vice president for electric transmission for Dominion. "We will have severe overloads beginning in 2011, and we are at risk of having blackouts during peak days."

- The region being considered for the Dominion line includes portions of Virginia's Frederick County as well as Warren, Clarke, Fauquier, Prince William and Loudoun, regions where landowners and conservationists have spent millions of dollars to keep development at bay.

- The area includes more than 20 miles of the Appalachian Trail, which the line could have to cross. Among the Civil War battlefields it might affect is Guard Hill near Front Royal, where 550 soldiers died Aug. 16, 1864.

- *"This is probably the densest corridor of conservation easements certainly in Virginia and maybe even the entire East Coast," said Bob Lee, executive director of the Virginia Outdoors Foundation, which holds about 80,000 acres of easements in Dominion's study area.*

- *The easements are supposed to last forever, and some conservationists worry about the precedent that may be set if power companies are able to erect transmission lines despite such growth-control measures.*

- *[The power line] is part of $1.3 billion worth of transmission line upgrades approved by PJM, an agency that manages the electrical grid in about a dozen states. [D]ubbed the Allegheny Mountain path, [it] is one of two large transmission line projects in the region. An even higher-voltage line, the Delaware River path, would slice through Western Maryland on its way to New Jersey from West Virginia. It is in the preliminary stages, but Ohio-based American Electric Power is already seeking the "national interest" designation for it.*

- *The U.S. Department of Energy has labeled the entire mid-Atlantic region from New York City to Northern Virginia a "critical congestion area," meaning its electricity use greatly outstrips the ability to safely and economically deliver it.*

18. On November 21, 2006, the Navy commenced its EIS process. Pursuant to Section (102)(2)(C) of the National Environmental Policy Act (NEPA) of 1969, the regulations implemented by the Council on Environmental Quality (40 CFR parts 1500-1508), and the Department of the Navy NEPA regulation (32 CFR part 775), the Department of the Navy announced its intent to prepare an EIS to evaluate the potential environmental impacts associated with relocation of certain WRAMC activities from Washington, DC, to the NNMC in Bethesda, MD per Public Law 101-510, the Defense Base Closure and Realignment Act of 1990 (BRAC Law).

19. On May 7, 2007, DOE issued a notice in the Federal Register which presented and solicited comment on the draft designation of the Mid-Atlantic Area National Interest Electric Transmission Corridor ("NIETC"). Therein, in Section VIII.C, DOE stated its belief that economic development, reliability, supply diversity and energy independence, and national defense and homeland security considerations warrant designation of a national interest electric transmission corridor for the MACCA. DOE determined that if

9

action is not taken to address congestion in the MACCA, "consumers in the Baltimore-Washington-Northern Virginia area, the northern New Jersey area, and southeastern New York face threats to the reliability of their electricity supply."

20. On September 30, 2007, the Washington Post published an article on page 1 of its Metro section entitled "D.C. Area Outpaces Nations in Pollution--High Carbon Emission Blamed On Coal Plants." The article included the following text:

> The Washington area produces more carbon dioxide than several medium-size European countries, according to a new estimate of local emissions, as the region's crawling traffic and coal-fired power plants give it a pollution "footprint" out of proportion to its size. The estimate, by the Metropolitan Washington Council of Governments, seems to be the first official attempt to put a number on the region's contributions to climate change. And the number is big: 65.6 million metric tons of carbon dioxide were emitted here in 2005. That was more than in all of Hungary, Finland, Sweden, Denmark or Switzerland, each of which has more people. Within the region, the estimate shows that the Maryland suburbs -- often stereotyped as green-leaning and blue-voting -- produce more carbon dioxide than either the Virginia suburbs or the District. One major reason: It is home to three coal-burning power plants. The region is polluting on a globally significant scale, it shows, and getting steadily worse. Also, the area is home to several coal-burning power plants, the type of plant that supplies nearly half the country's electricity. Together, power plants in the region produced about 20 million metric tons of carbon dioxide in 2005, or two times the output of Armenia. "We rely heavily on coal," said Montgomery County Council member George L. Leventhal (D-At Large), who has been active on environmental issues. "And coal is dirty." The impact of coal seems especially evident in the figures for Maryland, which has emissions almost equal to those of the District and Northern Virginia combined. Cleaning up the emissions from these coal-fired plants is, for now, a tall order because technology to capture and store carbon dioxide is not in wide use. For the moment, climate activists would like to see states reduce their overall energy use so that less coal needs to be burned. Eventually, they hope that cleaner

10

*energy sources will be found. Although local officials are promising to reduce carbon dioxide emissions in the coming decades, the COG report shows that pollution is actually going the other way: up. At the current pace, it forecasts, emissions will increase 35 percent by 2030.*

21. On October 5, 2007, DOE issued an Order designating the Mid-Atlantic National Interest Electric Transmission Corridor ("NIETC"), comprising over 200 counties in eight Mid-Atlantic states, including Northern Virginia, Washington, D.C. and all of the State of Maryland (more than 116,000 square miles from upstate New York through Ohio). NIETC status is a new designation created by Section 1221 of the Energy Policy Act of 2005, and is designed to speed up siting of interstate high-voltage transmission lines that could supply additional electricity to the critically congested MACCA. Designation of the Mid-Atlantic NIETC gives the Federal Energy Regulatory Commission ("FERC") power to authorize, in certain circumstances, the construction of transmission lines that would normally be subject to State authorization. The designation also gives electric utilities access to federal eminent domain, in certain circumstances, for the siting of high-voltage transmission lines within the designated Corridor. In summary, the NIETC designation would under specific circumstances, enable a utility to obtain a transmission line construction permit from the FERC if, for example a State has withheld approval for more than one year, and acquire the right of way to build the line by exercising the right of eminent domain in either Federal or State Court, if it cannot acquire the right of way through negotiation with a private property owner.

22. On December 4, 2007, the Washington Post published an article on the front page of its Metro section entitled "Power Outages Forecast for Md." The article included the following statements:

- *The Maryland Public Service Commission said in [a] report, released last night, that the excessive rates and threats to the region's power supply are so dire that it must step in, using its authority to force utility companies to buy more electricity. The regulatory agency also plans to require utilities to implement an aggressive series of conservation programs that would, for example, reward customers with rebates if they turn off their air conditioners on hot days. The shortage could be so severe by 2011 that regulators might need to require "mandatory use restrictions and rolling*

11

blackouts," the report says [and] "Unless steps are taken now, Maryland faces a critical shortage of electricity capacity."

- Population growth, ever-larger houses with electricity-hungry gadgets, poor planning for new power sources and an aging, bottlenecked network of transmission lines have threatened the reliability of the power grid, the regulators say.

- With an expected 17 percent rise in demand from 2005 to 2016 and no major new transmission lines to move electricity from distant low-cost plants into Maryland, the state could be woefully short on power.

- The estimated shortfall of 1500 megawatts is the equivalent of the electricity put out by two coal-fired power plants, Larsen will tell lawmakers.

- Constellation Energy Group, Maryland's largest power generator with three coal-fired plants and the Calvert Cliffs nuclear plant, is reviewing options to enhance the state's electricity supply by reactivating some of its mothballed plants or building new ones. It's unclear when any new power sources would come on line.

- Two massive high-voltage transmission lines are planned to relieve the stressed mid-Atlantic grid, one stretching from West Virginia across Western Maryland and the other through Pennsylvania and New Jersey.

23. On December 14, 2007, the Environmental Protection Agency ("EPA") and the Navy published a Notice of Availability ("NOA") for the Draft EIS for the National Naval Medical Center ("DEIS") in the Federal Register. The publication of the NOA initiated a 45-day public review and comment period for the DEIS, which ended on January 28, 2008.

24. On January 24, 2008, the Director of the Office of Research Facilities Development and Operations at the National Institutes of Health provided comments on the DEIS, as follows:

Section 4.12.6 Page 4-78, (Cumulative Impacts to Utility Infrastructure) states: "Because the new BRAC projects that add to utility demands at NNMC reduce demands at WRAMC by a like amount, the NNMC projects do not incrementally increase regional demand. Locally, utility

12

*providers have indicated that NNMC demands for BRAC can be met; therefore the incremental effects of adding these demands to those of other off-Base projects are not considered to be significant. NIH requests that more detailed utility information be provided in the cumulative analysis of utility demand impacts. The incremental increase of the WRNNMC in addition to the existing NNMC demand in addition to the demands by NIH have not been analyzed in enough depth to determine that there will be no impact. Because localized brownouts have occurred in the immediate area during the summer months, a more involved study on utility demand impacts should be addressed in the FEIS [Final Environmental Impact Statement]. The Draft EIS states that there is correspondence between the "local utility providers" and NNMC stating that the future demand can be met. NIH requests that this correspondence be published in the FEIS.*

25. The Navy responded, in part, as follows:

*An in depth analysis cannot occur until additional design occurs. Clarifying text has been added to Section 4.12.6. Documentation that Pepco can support build out is referenced in the DEIS (NAVFAC 2007e): the Pepco Account Manager acknowledges the planned increase in electrical loading at NNMC and states that Pepco will provide NNMC with adequate supply to serve the facility's increased load.*

26. On January 28, 2008, Plaintiff Lemon provided extensive comments on the DEIS, including the following comments:

*"The DEIS does not adequately assess the potentially significant cumulative environmental impacts of the proposed action. This missing analysis is of such a magnitude that it warrants full public review at the draft stage of the EIS. Accordingly, the DIES does not meet the purposes of NEPA and thus should be formally revised and made available for public comment in a supplemental or revised DEIS. The issues raised herein are significant, and involve obvious flaws in the Navy's analysis. [The] Navy failed to analyze the cumulative impacts of the proposed action on utilities, land use, cultural resources, and the global climate ... even though those impacts*

13

*have been highly publicized and are believed to be very significant. [Why] was [the EIS] completely silent on all matters concerning [electricity] congestion, transmission lines, [and] coal-fired generation for [the proposed action's] electrical equipment vs. solar or fuel cell/gas on-site [combined heat and power]? Why was there no urgency to address these environmental issues even while under the spotlight of a NEPA-mandated EIS review? Given the short fuse, why is the Navy not diligently pursuing non-transmission solutions to the MACCA's congestion problem, just as diligently as DOE and the utility industry are pursuing transmission solutions?"*

27. The Navy responded as follows:

*Because the new BRAC projects that add to utility demands at NNMC reduce demands at WRAMC as functions move from older less efficient buildings at WRAMC to LEED Silver certified buildings at NNMC, the NNMC projects are not expected to significantly increase regional demand.*

28. On February 3, 2008, The Washington Post published a front page article entitled "Threat of Power Shortages Generating New Urgency" which included the following statements:

- *The region's increasing energy needs are attributable, in part, to its increasing population.*
- *Washington area residents and businesses also seem to be using many more kilowatts per capita than in the past.*
- *In Northern Virginia, 22 computer data centers have been built, and 24 more are on the way, according to Dominion Power. Those hives of computer servers are often the size of a small Wal-Mart, and they use about 25 times as much power.*
- *The growth in electricity demand has some serious environmental downsides. In Appalachia, some of the area's coal has been extracted through "mountaintop removal mining," burying mountain streams and causing major damage to the landscape.*
- *The region's emissions of carbon dioxide -- a major greenhouse gas -- have grown rapidly, because of its heavy reliance on coal-burning power plants.*

14

- *In December, a study by the Maryland Public Service Commission found that the state might face rolling blackouts as early as 2011 or 2012.*

- *Power companies are pressing for a wave of projects.*

- *Three power transmission lines have ... been proposed in the area. One would begin in Prince William County, jog over to Southern Maryland and then cross the Chesapeake Bay to the Eastern Shore. The others would link the region with power plants in southwestern Pennsylvania and West Virginia.*

29. On March 24, 2008, the New York Times published an editorial entitled "Parks in Peril" that included the following statements:

- *"The country's treasured open spaces are no more immune to air pollution from coal-fired power plants than are its big cities. Sulfur dioxide causes acid rain and kills trees. Mercury emissions poison streams. Nitrogen oxides and sulfates create smog and haze."*

- *"[O]ne in three national parks suffers from one or another form of air pollution, including immensely popular destinations like Yosemite in California, Great Smoky Mountain, straddling the Tennessee-North Carolina border, and Gettysburg."*

30. On April 3, 2008, the Navy published a Notice of Availability for the Final Environmental Impact Statement ("FEIS") on the Base Realignment and Closure Actions proposed at the NNMC. The next day, the Environmental Protection Agency published its Notice of Availability for the NNMC FEIS. The FEIS included the following statements relevant to the issues raised in this complaint:

- Electrical Utilities: *The proposed BRAC Actions are expected to increase the current electric demand of 18 MVA by approximately 7.03 MVA to 25.03 MVA. It is reported that the four existing PEPCO feeders cannot safely handle this increase in load in their current configuration. The NAVFAC manager of high voltage systems and the Navy's electrical engineering consultant (NAVFAC, 2007e) believe doubling the capacity of two of the existing feeders would provide adequate power for the large BRAC project additions. A new primary switchgear*

15

*arrangement would be required and the existing four feeder arrangement would have to be reconfigured with two feeders having their capacity doubled via adding two parallel feeders. PEPCO is capable of adding up to four parallel feeders to NNMC (NAVFAC, 2007e).*

- *Provision of services for ... electric power is not expected to have an impact on regional supplies or the foreseeable projects on or outside the Base; however, upgrades to utilities feeding NNMC could be required. Detailed engineering evaluations have not yet been performed of provider requirements, awaiting design data for each facility. The on-Base projects being considered under cumulative impacts would add an estimated 12 to 18 percent in utility demand above the projects of the Proposed Action, based on very preliminary assumptions that correspond to the square footage and number of people involved. Therefore, incremental effects are not expected to be significant. Because the new BRAC projects that add to utility demands at NNMC reduce demands at WRAMC as functions move from older less efficient buildings at WRAMC to LEED Silver certified buildings at NNMC, the NNMC projects are not expected to incrementally increase regional demand. Locally, electrical and water/wastewater providers have indicated that the NNMC demands for BRAC can be met; therefore, the incremental effect of adding these demands to those of other off-Base projects are not considered to be significant.*

- Air quality: *cumulative air quality effects are not significant and would not pose a significant incremental effect to any other projects.*

- Cultural resources: *Impacts are specific to resources on NNMC and are fully covered by the discussion of potential impacts in Section 4.8. There is no incremental effect when the proposed BRAC projects are added to these other actions.*

- Land use: *The proposed alternatives are consistent with the medical purposes for land use within NNMC and are also consistent with land use for the area, they do not cause significant adverse cumulative impacts.*

31. On April 20, 2008, the *Washington Post* published a front page article entitled "Stripping Mountains to Power D.C." which described the environmental damage caused by massive "mountaintop coal mining" in the Appalachian Mountains to fire power plants that supply electricity to the multi-state regional power grid that serves the Washington region's growing demand for electricity.

32. On April 23, 2008, The Christian Science Monitor published an article entitled "Why national parks, coal-fired power plants may be neighbors." The article included the following statement:

- *On some days [in Virginia's Shenandoah National Park], thick air already obscures mountains just a few miles distant...so adding six new coal-fired power plants nearby, as is proposed, might make view-gazing impossible.*

33. On May 1, 2008, Plaintiff Lemon notified the Navy that he objected to the FEIS for the following reasons:

- *[A]s requested in my comments, the DEIS was not formally revised to analyze the three Cumulative Impacts addressed in my comments, and subsequently made available for public comment in a Supplemental or revised DEIS;*
- *[T]he FEIS itself does not analyze any of the three cumulative impacts identified in the comments I made to the DEIS; and (3) in the FEIS, the Navy's response (to my comments) that "...the NNMC projects are not expected to significantly increase regional [utility] demand" is irrelevant and non-responsive to the cumulative impact issues addressed in my comments."*
- *"This is also to advise that I intend to seek whatever remedies are available to members of the public, including legal action if necessary, to ensure that the environmental impacts addressed in my comments are fully analyzed in accordance with the NEPA statute and associated CEQ and Navy regulations, and mitigated as appropriate. Toward that end, I would appreciate it if you*

17

*could inform me of any administrative appeal or other appeal mechanisms that are available to me in this situation."*

34. On May 14, 2008, as stated above, the Navy published its Record of Decision ("ROD") in the Federal Register with regard to the proposed action. The ROD is the final agency action to date with regard to the proposed action. The ROD included the following statements relevant to the issues raised in this complaint:

- Infrastructure. *Based on initial estimates of utility demands and provider capacity, no major issues are anticipated. The new BRAC projects that add to utility demands at NNMC reduce demands at WRAMC as functions move from older, less efficient buildings at WRAMC to LEED Silver certified buildings at NNMC. As designs are finalized, additional utility studies will be conducted to identify whether improvements to any utility lines or pipes within or outside NNMC are appropriate and these improvements would be implemented as part of the construction. The NNMC systems have adequate redundancy to assure an ability to provide continued service while any line is shut own.*
- Cumulative Impacts. *The conservative use of an estimated 2,500 new employees versus the actual new employee estimate of 2,200 is expected to address potential cumulative impacts for additional employees (currently estimated as 136) for other ongoing and foreseeable future on installation projects not associated with BRAC. The actions of the Preferred Alternative are not expected to result in significantly greater incremental impacts when added to the actions of other projects, except as has been already discussed for each environmental resource area above.*

35. On May 15, 2008, one day after the Navy issued its ROD, the National Parks Conservation Association issued a report designating Shenandoah National Park as one of ten National Parks most threatened by pollution from new coal-fired power plants.

## THE NAVY'S OBLIGATIONS UNDER NEPA

### NEPA's Requirements

36. The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations AT 40 CFR 1500 implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101. [40 CFR 1500.1]

37. Federal agencies shall to the fullest extent possible use all practicable means, consistent with the requirements of the NEPA and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment. [40 CFR 1500.2(f)]

38. NEPA requires federal agencies to consider environmental harms and the means of preventing them in an Environmental Impact Statement ("EIS") before approving "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Major federal actions" include projects such as WRNNMC that are "entirely or partly financed ... by federal agencies." 40 C.F.R. § 1508.18(a).

39. In preparing an EIS, agencies must disclose the "environmental consequences" of a proposed agency action, including its direct, indirect, and cumulative impact. See id. §§ 1502.16(a), (b), 1508.8. As defined by regulation, cumulative impact means "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such other actions." Id. § 1508.7.

40. Further, agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action. 40 C.F.R. § 1502.14(a). Consideration of alternatives is "the heart of the environmental impact statement," because it compels agencies to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." Id.

41. To elicit this informed comparison of alternatives, NEPA's implementing regulations specifically demand that an EIS consider:

- Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned.
- The environmental effects of alternatives including the proposed action.
- Energy requirements and conservation potential of various alternatives and mitigation measures.
- Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.
- Means to mitigate adverse environmental impacts  [40 CFR 1502.16]
- Plus Supplemental requirement

42. In the event circumstances change, or new information becomes available, agencies must address any significant implications for the proposed action in a supplemental EIS ("SEIS"). NEPA's implementing regulations provide that agencies "[s]hall prepare supplements to either draft or final environmental impact statements if: ... [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed actions and its impacts." Id. § 1502.9(c)(1)(ii).

**FIRST CAUSE OF ACTION**

**Violation of NEPA**

(Failure to address Cumulative Impacts of the Proposed Action)

43. Plaintiff re-alleges and incorporates paragraphs 1 through 42

44. The Navy failed to disclose the environmental consequences resulting from the cumulative impacts of its proposed action with regard to utilities, land use, cultural resources, air quality and global climate change.

45. Specifically, the Navy failed to disclose the environmental consequences that will result from the incremental impacts of the proposed action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such other actions, on:

A.  electricity congestion in the Mid-Atlantic Critical Congestion Area;

B.  mountaintop mining in West Virginia;

C.  the protection of protected private property and preserved historic sites and national parks in the Mid-Atlantic National Interest Electric Transmission Corridor;

D.  air quality in AQCR-47;

E.  reduced visibility in Shenandoah National Park and Gettysburg National Military Park; and

F.  global climate change.

## SECOND CAUSE OF ACTION

### Violation of NEPA

(Failure to consider means to mitigate adverse environmental impacts)

46. Plaintiffs re-allege and incorporate paragraphs 1 through 45.

47. The Navy failed to consider means to mitigate the environmental consequences resulting from the cumulative impacts of its proposed action.

48. Specifically, the Navy failed to consider the robust integration of distributed generation technologies located at or near the proposed action, including solar photovoltaics, small wind turbines,  microturbines

21

and fuel cells, and especially those operating on renewable fuels or yielding particularly high overall efficiencies, such as those with combined heating, cooling and power, all of which would reduce the proposed action's requirement for imports of electricity generated by coal-fired power plants via critically congested high-voltage transmission lines.

## REQUEST FOR RELIEF

Therefore, Plaintiff requests that this Court:

1. Declare that the Navy violated NEPA and its implementing regulations in failing to disclose the environmental consequences resulting from the cumulative impacts of its proposed action;

2. Declare that the Navy violated NEPA and its implementing regulations in failing to consider means to mitigate the environmental consequences resulting from the cumulative impacts of its proposed action with regard to utilities, land use, cultural resources, air quality and global climate change;

3. Declare that the Navy violated NEPA and its implementing regulations in failing to revise its EIS to analyze and consider those cumulative impacts and resulting environmental consequences, and means of mitigation.

4. Invalidate the May 14, 2008 ROD;

5. Issue an injunction prohibiting the Navy from proceeding with any aspect of the proposed action that would preclude mitigation of the cumulative impacts described above, until the agency confronts those impacts by formally revising the EIS and making it available for public comment in a supplemental or revised draft EIS ("DEIS").

6. Award Plaintiff his reasonable fees, costs, and expenses, including attorneys fees, associated with this litigation; and

7. Grant Plaintiff such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 14th day of July, 2008,

Jim Lemon

714 Hunter Court SW

Vienna, VA 22180

703-242-6254 (h)

202-336-7462 (w)

CS-1197
RCL

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I. (a) PLAINTIFFS

JIM LEMON

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __88888__
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

THE HONORABLE DONALD C WINTER
SECRETARY OF THE NAVY

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT __11001__
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

JIM LEMON
714 HUNTER CT. SW
VIENNA, VA 22180

Case: 1:08-cv-01197
Assigned To : Lamberth, Royce C.
Assign. Date : 7/14/2008
Description: Admn. Agency Review

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)   FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☒ | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ |
| Citizen of Another State | ☒ | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ☐ A. Antitrust | ☐ B. Personal Injury/ Malpractice | ☒ C. Administrative Agency Review | ☐ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br><br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☒ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

## ☐ E. General Civil (Other)   OR   ☐ F. Pro Se General Civil

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

③

| □ G. *Habeas Corpus/* 2255 | □ H. *Employment Discrimination* | □ I. *FOIA/PRIVACY ACT* | □ J. *Student Loan* |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| □ K. *Labor/ERISA (non-employment)* | □ L. *Other Civil Rights (non-employment)* | □ M. *Contract* | □ N. *Three-Judge Court* |
|---|---|---|---|
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**ⓧ ORIGIN**

① Original Proceeding    □ 2 Removed from State Court    □ 3 Remanded from Appellate Court    □ 4 Reinstated or Reopened    □ 5 Transferred from another district (specify)    □ Multi district Litigation    □ 7 Appeal to District Judge from Mag. Judge

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*5 U.S.C 701*
*ADMINISTRATIVE PROCEDURES ACT - VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT OF 1969*

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS    □ ACTION UNDER F.R.C.P. 23    **DEMAND $** _____    Check YES only if demanded in complaint
**JURY DEMAND:** □ YES    ⊗ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    ⊗ YES    □ NO    If yes, please complete related case form.

DATE 7/14/08    SIGNATURE OF ATTORNEY OF RECORD    *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.